IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 10-cv-00725-CMA-BNB

FREDERICK D. DEBERRY,

Plaintiff,

v.

BLAKE R. DAVIS,
J. FOX, and
D. SPROUL,

Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

This matter arises on the defendants' **Motion to Dismiss** [Doc. #18, filed 08/26/2010]

(the "Motion"). I respectfully RECOMMEND that the Motion be GRANTED.

## I. STANDARD OF REVIEW

The plaintiff is proceeding *pro se*, and I must liberally construe his pleadings. Haines v.

Kerner, 404 U.S. 519, 520-21 (1972). I cannot act as advocate for a *pro se* litigant, however,

who must comply with the fundamental requirements of the Federal Rules of Civil Procedure.

Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

In ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept the

plaintiff's well-pleaded allegations as true and must construe all reasonable inferences in favor of

the plaintiff. City of Los Angeles v. Preferred Communications, Inc., 476 U.S. 488, 493 (1986);

Mitchell v. King, 537 F.2d 385, 386 (10th Cir. 1976). The complaint must contain specific

allegations sufficient to establish that it plausibly supports a claim for relief. Alvarado v. KOB-

TV, L.L.C., 493 F.3d 1210, 1215 n.2 (10th Cir. 2007).  "The issue is not whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."

Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer,

468 U.S. 183 (1984).

      In ruling on a motion to dismiss for failure to state a claim upon which relief can be

granted, I may treat the motion as a Rule 56 summary judgment motion when matters outside the

pleadings are presented to and not excluded by me, and all parties have been given a reasonable

opportunity to respond as provided in Rule 56.  Fed. R. Civ. P. 12(d).  A party is deemed to have

been given a reasonable opportunity to respond if the party does not attempt to exclude the

supporting documents, but files its own sworn affidavits in response.  Nichols v. United States,

796 F.2d 361, 364 (10th Cir.1986).

      The plaintiff attached a declaration[1] and several exhibits to his response .  *Plaintiff's Brief*

*in Response and Opposition to Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P.*

*12(b)(1) and 12(b)(6)* [Doc. #26] (the "Response").  Because I do not refer to the attachments in

my analysis of the defendants' Motion to Dismiss, I need not convert the motion into one for

summary judgment.  Fed. R. Civ. P. 12(d).

## II.  BACKGROUND

      The plaintiff filed his Amended Prisoner Complaint [Doc. #8] (the "Complaint") on May

20, 2010.  The Complaint contains the following allegations:

---

[1]The declaration merely restates the allegations made in the Complaint, which are made
under penalty of perjury pursuant to 28 U.S.C. § 1746 and 18 U.S.C. § 1621.

1.   The plaintiff is currently incarcerated by the Federal Bureau of Prisons ("BOP") at the United States Prison, Administrative Maximum in Florence, Colorado ("ADX"). *Complaint*, p. 2.

2.   On March 18, 2009, while housed in the D/B unit, a "pre-transfer" "step-down unit," the plaintiff received an incident report charging him with involvement in an altercation with another prisoner. Id. at p. 4.

3.   The plaintiff was moved from the D/B unit to the ADX General Population pending resolution of the incident report. Id.

4.   On April 7, 2009, a Disciplinary Hearing Officer ("DHO") found the plaintiff guilty of "Disruptive Conduct (Most Like Fighting)." Id. at p. 3.

5.   The plaintiff appealed the DHO's findings. Id. at p. 4.  On May 28, 2009, it was decided that the DHO had made a procedural error, and the incident report was returned to the ADX for reconsideration. Id.

6.   On July 21, 2009, the DHO set aside his previous finding of guilt; expunged the incident report; and restored the plaintiff's privileges. Id.

7.   Subsequently, the plaintiff filed an "Attempt at Administrative Remedy" requesting that he be restored to his previous status in the D/B unit and credited for the time he spent in the ADX pending final resolution of the incident report. Id.

8.   On August 13, 2009, defendant Davis issued a decision denying the plaintiff's request and "assuring" that the plaintiff's continued placement in the ADX General Population was appropriate. Id.

3

9.   On or about September 22, 2009, defendant Sproul issued an Informal Institution Memorandum acknowledging that the incident report had been expunged but recommending that the plaintiff remain in the ADX General Population units for at least one year and that he complete recommended programs before being placed back into the ADX step-down program. Id. at pp. 4, 10.  This decision was approved by defendant Fox without justification.  Id. at p. 10.

10.   The plaintiff asked defendant Fox why he was not restored to his prior status after the incident report was expunged.  Fox stated that he and the administration decided that the plaintiff "should remain in the ADX G.P. units for at least a year with clear conduct, and participate in and complete all programs recommended by the G.P. Unit Team members before consideration for placement back into the ADX Step-Down Programs." Id. at pp. 10-11.  Fox refused to provide a justification for this decision.  Id. at p. 11.

11.   On or about November 12, 2009, the plaintiff was removed from the ADX General Population and placed in the Intermediate Step-Down Program, J-Unit, at ADX.  Id. at p. 12.

12.   On or about November 13, 2009, and on or around February 25, 2010, the plaintiff asked defendant Sproul why he was placed back in the ADX General Population after the incident report was expunged.  Sproul refused to provide an explanation.  Id.

The plaintiff asserts that the defendants' refusal to return him to his status in the D/B unit violates his constitutional rights to due process and equal protection and violates his right to be free from double jeopardy.  Id. at pp. 4-5.  He seeks declaratory, injunctive, and monetary relief. Id. at pp. 8, 15-17.

### III.  ANALYSIS

The defendants assert that they are entitled to qualified immunity. *Motion*, p. 9.

Qualified immunity shields government officials sued in their individual capacities from liability

for civil damages provided that their conduct when committed did not violate "clearly established

statutory or constitutional rights of which a reasonable person would have known." Harlow v.

Fitzgerald, 457 U.S. 800, 818 (1982).  In order for a right to be "clearly established" for purposes

of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right." Anderson v. Creighton, 483

U.S. 635, 640 (1987).

When analyzing the issue of qualified immunity, I  consider two factors.  I must

determine whether the plaintiff has sufficiently alleged a violation of a statutory or constitutional

right.  In addition, I must inquire whether the right was clearly established at the time of the

violation.  Wilson v. Layne, 526 U.S. 603, 609 (1999); Butler v. City of Prairie Village, Kansas,

172 F.3d 736, 745 (10th Cir. 1999).[2]

### A.  Due Process

The plaintiff claims that the defendants' failure to return him to the D/B unit after the

incident report was expunged violated his due process rights. *Complaint*, pp. 4, 10-15.

The Fifth Amendment guarantees due process when a person may be deprived of life,

liberty, or property.  U.S. Const. amend. V.  The Due Process Clause "shields from arbitrary or

capricious deprivation those facets of a convicted criminal's existence that qualify as 'liberty

---

[2]The order in which I may consider these factors is discretionary.  Pearson v. Callahan,
555 U.S. 223, __, 129 S. Ct. 808, 818 (2009); Manzanares v. Higdon, 2009 WL 2430643 *3 n.6
(10th Cir. Aug. 10, 2009).

interests.'" Harper v. Young, 64 F.3d 563, 564 (10th Cir. 1995), aff'd, 520 U.S. 143 (1997). Thus, before determining whether a plaintiff's procedural or substantive due process rights have been violated, the court must determine whether the plaintiff has a liberty interest.

"[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." Wilkinson v. Austin, 545 U.S. 209, 221 (2005). Nevertheless, the state or federal government "may under certain circumstances create liberty interests which are protected by the Due Process Clause." Sandin v. Conner, 515 U.S. 472, 483 (1995).[3] A prisoner's liberty interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, [] nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 483-84.

The following considerations are relevant to the inquiry of what constitutes an atypical and significant hardship: (a) whether the conditions of the plaintiff's confinement relate to and further a legitimate penological interest such as safety or rehabilitation; (b) whether the conditions are extreme; (c) whether placement in the conditions increases the duration of the plaintiff's confinement; and (d) whether placement in the conditions is indeterminate. Estate of Dimarco v. Wyo. Dept. of Corr. Div. of Prisons, 473 F.3d 1334, 1342 (10th Cir. 2007).

---

[3]In Sandin, the Court eschewed the methodology it had previously applied to determine the existence of a liberty interest. The prior methodology required examination of prison regulations "to determine whether mandatory language and substantive predicates created an enforceable expectation that the State would produce a particular outcome with respect to the prisoner's conditions of confinement." 515 U.S. at 480-81. The Court instead returned to the due process principles that were established and applied in Meachum v. Fano, 427 U.S. 215 (1976), and Wolff v. McDonnell, 418 U.S. 539 (1974). Those principles focus on the nature of the deprivation instead of the language of a particular regulation. Sandin, 515 U.S. at 481.

In <u>Wilkinson</u>, the Supreme Court found that a combination of factors rose to the level of

atypical and significant hardship at Ohio's Supermax facility, the Ohio State Penitentiary

("OSP"):

> In OSP almost every aspect of an inmate's life is controlled and
> monitored. Inmates must remain in their cells, which measure 7 by
> 14 feet, for 23 hours per day. A light remains on in the cell at all
> times, though it is sometimes dimmed, and an inmate who attempts
> to shield the light to sleep is subject to further discipline. During
> the one hour per day that an inmate may leave his cell, access is
> limited to one of two indoor recreation cells.
>
> Incarceration at OSP is synonymous with extreme isolation. In
> contrast to any other Ohio prison, including any segregation unit,
> OSP cells have solid metal doors with metal strips along their sides
> and bottoms which prevent conversation or communication with
> other inmates. All meals are taken alone in the inmate's cell
> instead of in a common eating area. Opportunities for visitation
> are rare and in all events are conducted through glass walls. It is
> fair to say OSP inmates are deprived of almost any environmental
> or sensory stimuli and of almost all human contact.
>
> Aside from the severity of the conditions, placement at OSP is for
> an indefinite period of time, limited only by an inmate's sentence.
> For an inmate serving a life sentence, there is no indication how
> long he may be incarcerated at OSP once assigned there. Inmates
> otherwise eligible for parole lose their eligibility while incarcerated
> at OSP.

209 U.S. at 213-14 (internal quotations and citations omitted).

The Court found a liberty interest in avoiding placement at OSP:

> Save perhaps for the especially severe limitations on all human
> contact, these conditions likely would apply to most solitary
> confinement facilities, but here there are two added components.
> First is the duration. Unlike the 30-day placement in <u>Sandin</u>,
> placement at OSP is indefinite and, after an initial 30-day review,
> is reviewed just annually. Second is that placement disqualifies an
> otherwise eligible inmate for parole consideration. While any of
> these conditions standing alone might not be sufficient to create a

> liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP.

Id. at 224 (internal quotations and citations omitted).

In Jordan v. Federal Bureau of Prisons, 191 Fed.Appx. 639 (10th Cir. July 25, 2006),[4] the Tenth Circuit applied the principles set forth in Wilkinson to an inmate's conditions of confinement at ADX. The court determined that the plaintiff, who was held in administrative detention at ADX for five years while being investigated for a murder, did not suffer atypical and significant hardship. The undisputed material facts demonstrated that all inmates in administrative maximum confinement were provided access to "the commissary, institution programming, mental health and medical services, leisure and law libraries, five hours a week recreation, a hobby craft, telephone, correspondence, and visitors." Id. at 644, 648-50. In addition, they had "opportunities to gain employment as a unit orderly; access to legal assistance from another inmate; and to interact with a case manager, unit counselor, unit manager, custody staff, and department heads." Id. Although they are housed "in single cells and cannot move about as in an open population facility, they are offered the same programs and afforded the same privileges as inmates in the general population, except that administrative detention inmates: 1) are allowed only one social call per month, while general population inmates are allowed two per month; and 2) do not receive the twelve hours recreation time general population inmates on group recreation status receive, but receive the same five hours of individual recreation that general population inmates on single recreation status receive." Id.

––––––––––––––––––––

[4]Copies of all unpublished opinions cited in this Order are attached.

The court recognized that <u>Wilkinson</u> was instructive, but was "not dispositive here, as the conditions of Mr. Jordan's administrative detention were obviously not as onerous, given 1) he admittedly had frequent contact with staff; 2) the length of his sentence was not affected by the administrative detention; and 3) his confinement was not indefinite but instead limited to the duration of the pending murder investigation." <u>Id.</u> at 652.

Guided by <u>Wilkinson</u>, <u>Dimarco</u>, and <u>Jordan</u>, I look to the Complaint's allegations to determine whether it is plausible that the conditions and restrictions in the ADX General Population imposed an atypical and significant hardship on the plaintiff when compared to the normal incidents of prison life and thereby created an enforceable liberty interest in avoiding such conditions and restrictions.

The Complaint alleges that the plaintiff was initially returned to the ADX General Population pending resolution of the incident report and that after the report was expunged, defendant Fox stated that the administration decided that the plaintiff "should remain in the ADX G.P. units for at least a year with clear conduct, and participate in and complete all programs recommended by the G.P. Unit Team members before consideration for placement back into the ADX Step-Down Programs." Complaint [Doc. # 8] at pp. 4, 10-11. The plaintiff asserts that the defendants used the "contents of the incident report" and "the unproven charges therein" as the basis to keep him in the ADX General Population instead of returning him to the D/B unit. *Response*, pp. 8-9. Construing all reasonable inferences in favor of the plaintiff, the defendants kept the plaintiff in the ADX General Population after the incident report was expunged based on an unproven disciplinary charge. Therefore, it appears that the defendants did not have a legitimate penological reason for keeping the plaintiff in the ADX General Population.

The Complaint conclusively alleges that the conditions in the ADX General Population were "more severe and restrictive" than the conditions in the D/B unit, and the plaintiff's eligibility for transfer out of the ADX programs has been extended from on or around October 2, 2009, to mid or late 2011. *Complaint*, pp. 14-15. In his Response, the plaintiff described the conditions of the ADX General Population to include five and a half hours a week of indoor recreation; six hours per week of outdoor recreation; thirty minutes of phone privileges per month; limited access to commissary items; and little or no opportunity to obtain work assignments. *Response*, p. 15.

The plaintiff does not allege nor argue that his placement in the ADX General Population affected his eligibility for parole, and the Complaint does not contain any allegations to create a reasonable inference that the plaintiff's placement in the ADX General Population was for an indeterminate period of time. To the contrary, the plaintiff alleges that his eligibility for transfer out of the ADX programs was merely extended from on or around October 2, 2009, to mid or late 2011. *Complaint*, pp. 14-15. Indeed, on or about November 12, 2009, the plaintiff was removed from the ADX General Population unit and placed in the Intermediate Step-Down Program, J-Unit, at ADX. It is obvious from the Complaint's allegations that the plaintiff's placement in the ADX General Population unit was not indeterminate.

Considering all of the plaintiff's allegations, it is not plausible that the plaintiff's placement in the ADX General Population imposed atypical and significant hardship on him in relation to the ordinary incidents of prison life. The conditions faced by the plaintiff in the ADX General Population were no more burdensome than conditions faced by other inmates in cases where the courts have ruled that there was no due process violation. Dimarco, 473 F.3d at 1343

10

(stating that although the plaintiff's conditions of protective confinement were "admittedly spartan," they were not atypical because she had access to the basic essentials of life, and she was not entitled to "every type of program available to other inmates, ranging from work to recreation"); Jordan 191 Fed.Appx. 639 (finding no liberty interest in conditions imposed during five-year administrative segregation confinement at ADX); Georgacarakos v. Wiley, Civil Action No. 07-cv-01712-MSK-MEH, 2010 WL 1291833, at *11-13 (D. Colo. March 30, 2010) (finding no liberty interest in conditions imposed in the ADX General Population); Saleh v. Federal Bureau of Prisons, Civil Action No. 05-cv-02467-PAB-KLM, 2010 WL 5464295, at *6-17 (D. Colo. Nov. 23, 2010) (recommendation finding no liberty interest in conditions imposed in the ADX General Population and stating that "when conditions which do not deviate from those at issue in *Jordan* and *Georgacarakos* have been pled in a complaint, they "do not give rise to a protected liberty interest") (adopted by the district judge in Doc. #373); Rezaq v. Nalley, Civil Action No. 07-cv-02483-LTB-KLM (D. Colo. Dec. 10, 2008) (Doc. #167) (accepting recommendation (Doc. #153) which found that conditions in ADX General Population did not implicate a liberty interest and that "to date no court in the Tenth Circuit has held that the conditions at ADX, regardless of unit, implicate a liberty interest").

Although the plaintiff alleges that there is no legitimate penological interest for placing him in the ADX General Population, "[i]t is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." Hewitt v. Helms, 459 U.S. 460, 468 (1983) (*overruled on other grounds by Sandin, 515 U.S. at 479-83*). See also Meachum v. Fano, 427 U.S. 215, 228 (1976) (stating that "[w]hatever expectation the prisoner may have in remaining at

11

a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all").

Considering the Complaint's allegations in their totality, it is not plausible that the plaintiff's confinement in the ADX General Population implicates a liberty interest. Therefore, the plaintiff's due process claim fails to state a claim upon which relief can be granted and should be dismissed.

## B.   Equal Protection

The plaintiff asserts that the defendants' actions violated his right to equal protection. *Complaint*, p. 4.  The Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend XIV, § 1.  The equal protection guarantee applies to the federal government through the Due Process Clause of the Fifth Amendment.  Adarand Constructors, Inc. v. Slater, 228 F.3d 1147, 1152 (10th Cir. 2000).  Equal protection mandates that the government shall treat similarly situated persons alike.  Id.

The Complaint does not allege any facts that would invoke the equal protection clause. See Fogle v. Pierson, 435 F.3d 1252, 1261 (10th Cir. 2006) (stating that because inmate classification is discretionary, it is not plausible to claim that there are other inmates who are similar in every relevant respect for purposes of equal protection claims).  The Motion should be granted insofar as it seeks dismissal of the plaintiff's equal protection claim.

## C.  Double Jeopardy

The plaintiff alleges that in requiring him to complete the ADX programs a second time, the defendants have subjected him to double jeopardy in violation of his constitutional rights. *Complaint*, p. 5.  "In the constitutional sense, jeopardy describes the risk that is traditionally associated with a criminal prosecution. . . . [T]he risk to which the [Double Jeopardy] Clause refers is not present in proceedings that are not essentially criminal." Breed v. Jones, 421 U.S. 519, 528 (1975).  "It is well established that prison disciplinary sanctions . . . do not implicate double jeopardy protections." Fogle, 435 F.3d at 1262.  The plaintiff's return to the ADX did not arise out of criminal proceedings.  The Motion should be granted insofar as it seeks dismissal of the plaintiff's double jeopardy claim.

## IV.  CONCLUSION

I respectfully RECOMMEND that the Motion be GRANTED and that the Complaint be DISMISSED WITH PREJUDICE for failure to state a claim upon which relief can be granted.[5]

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections.  A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed.R.Civ.P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.  In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000).  A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review

---

[5]Because I find that the plaintiff's claims should be dismissed for failure to state a claim upon which relief can be granted, I do not address the defendants' remaining arguments.

by the district court or for appellate review. <u>United States v. One Parcel of Real Property</u>, 73

F.3d 1057, 1060 (10th Cir. 1996).

     Dated February 3, 2011.

                    BY THE COURT:

                    <u>s/ Boyd N. Boland</u>
                    United States Magistrate Judge